Robert M. NORDGREN,
Plaintiff—Appellee,

v.

BURLINGTON NORTHERN RAILROAD
COMPANY, a Delaware Corporation,
Defendant—Appellant.

No. 95–3390.

United States Court of Appeals,
Eighth Circuit.

Submitted March 14, 1996.

Decided Dec. 2, 1996.

Rehearing and Suggestion for Rehearing
En Banc Denied Jan. 16, 1997.

HANSEN, Circuit Judge.

This is an interlocutory appeal pursuant to 28 U.S.C. § 1292(b) from an order denying the Burlington Northern Railroad Company's (BN) motion to amend its answer to assert a state-law counterclaim for property damages. The question before us is whether the Federal Employers' Liability Act (FELA), 45 U.S.C. §§ 51–60, precludes BN from asserting a counterclaim for property damages in responding to an employee's personal injury suit filed pursuant to FELA. We find no federal preemption and, accordingly, reverse and remand for further proceedings.

## I.

This case arose as a result of a collision involving two trains, one of which was a BN train operated by its conductor, Robert M. Nordgren. Nordgren filed this FELA cause of action, claiming that BN negligently failed to assure the proper operation of its approach signals and seeking damages for personal injuries he sustained in the collision. In its answer, BN contended the signals were in fact operating properly but Nordgren negligently failed to heed them. BN later moved for permission to amend its answer in order to add a counterclaim to recover the property damage BN sustained to its equipment in the collision as a result of Nordgren's alleged negligence.

A United States magistrate judge denied BN's motion on the basis that 45 U.S.C. § 55 of FELA prohibits BN's proposed counterclaim, therefore rendering it "futile and subject to dismissal or defeat by summary judgment." (Appellant's Addend. pt. C at 3.) BN appealed to the district court, and the district court affirmed the magistrate judge's ruling. Upon a motion by BN, the district court later amended its order to certify the following question of law for interlocutory appeal to this court:

Are state law claims for property damage to railroad equipment brought by a railroad engaged in interstate commerce and subject to the Federal Employer's Liability Act, 45 U.S.C. § 51, et seq., and/or the Federal Railway Labor Act, 45 U.S.C.

Charles Glaston Cole, Washington, DC, argued (Sara E. Hauptfuehrer and F. Franklin Amanat, on the brief), for Defendant–Appellant.

Don Charles Aldrich, Minneapolis, MN, argued, for Plaintiff–Appellee.

Before McMILLIAN, BEAM, and HANSEN, Circuit Judges.

§ 151, et seq., against employees who have concurrently sustained personal injury in the course of their railroad employment, preempted or precluded by federal law? We permitted an appeal to be taken to resolve this question of law.[1]

## II.

### A. Preemption Standard

The Supremacy Clause of the Constitution of the United States provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land." U.S. Const., art. VI, cl. 2. The question presented in this case is whether Congress has exercised its power under the Supremacy Clause so as to preempt BN's proposed state-law based counterclaim for property damages. In determining the answer to this question, the "ultimate touchstone" of our analysis is congressional intent. *Gade v. National Solid Wastes Mgmt. Ass'n,* 505 U.S. 88, 96, 112 S.Ct. 2374, 2381, 120 L.Ed.2d 73 (1992) (internal quotations omitted).

Congress may manifest its intent to preempt state law in various ways. First, Congress may create express preemption by explicitly stating its intent in the federal law at issue. Second, Congress may impliedly preempt a field of law where a scheme of regulation is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982) (internal quotations omitted). Finally, preemption may exist where state law is in conflict with federal law, that is, "where it is 'impossible for a private party to comply with both state and federal requirements' or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Freightliner Corp. v. Myrick,* — U.S. —, —, 115 S.Ct. 1483, 1487, 131 L.Ed.2d 385 (1995) (internal citations omitted). Thus, "[w]here a state statute conflicts with, or frustrates, federal law, the former must give way." *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 663, 113 S.Ct. 1732, 1737, 123 L.Ed.2d 387 (1993).

"In the interest of avoiding unintended encroachment on the authority of the States, however, a court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find preemption." *Id.* at 663–64, 113 S.Ct. at 1737–38. "[P]reemption will not lie unless it is 'the clear and manifest purpose of Congress.'" *Id.* at 664, 113 S.Ct. at 1737–38 (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). "To discern Congress' intent we examine the explicit statutory language and the structure and purpose of the statute." *Gade,* 505 U.S. at 96, 112 S.Ct. at 2381 (internal quotations omitted).

### B. Federal Employers' Liability Act (FELA)

Whether FELA precludes a railroad from counterclaiming for property damages is a question not yet addressed by either the Supreme Court or this court. Because the touchstone of our preemption analysis is congressional intent, we must determine the intended scope of FELA, which in turn requires us to "look to FELA itself, its purposes and background, and the construction [the Supreme Court] ha[s] given it over the years." *Consolidated Rail Corp. v. Gottshall,* 512 U.S. 532, ——, 114 S.Ct. 2396, 2403, 129 L.Ed.2d 427 (1994).

FELA, enacted in 1908, creates a federal statutory cause of action for employees of interstate carriers (railroads) against their employers for injuries incurred in the course of employment. Around the turn of the century, there was great concern that railroad employees who were injured in the course of their employment had no adequate remedy for their injuries. The general rule at the time was that a servant could sue his master for personal injuries incurred in the course of his employment, but the rule was subject to

---

**1.** Although the certified question refers to the Federal Railway Labor Act (FRLA), 45 U.S.C. § 151, et seq., we do not address the preemptive effect of that statute, if any, for the district court did not base its analysis on FRLA, and Nordgren has abandoned the FRLA issue on appeal.

at least three significant limitations, the first of which was the fellow-servant rule.

Under the fellow-servant rule, "[a] master is not liable for personal injuries occasioned to one servant by the tort of a fellow-servant employed in the same common service, unless (1) the fellow-servant is acting as a deputy-master or vice-principal, or (2) the master has negligently selected an incompetent fellow servant, or negligently retained one, or (3) by statute the master is made liable to one servant for the wrongful act or default of a fellow-servant." Ernest W. Huffcut, *The Law of Agency*, ch. XXIV, § 271 at 331 (2d ed.1901). The rationale for this rule was that in every employment contract there is an implied term that the servant shall assume all the ordinary risks of the business, including the negligence of fellow-servants employed in the same common service. *Id.*

In situations where the servant was able to overcome the fellow-servant rule, a second common-law rule, the doctrine of contributory negligence, barred his recovery if the servant himself had been at all negligent. *Id.* § 284 at 356. Finally, if the servant surmounted these common-law doctrines, he often found that his claim was barred by some form of contractual agreement or arrangement he had entered into with the railroad in order to obtain or maintain employment. *See Duncan v. Thompson*, 315 U.S. 1, 6, 62 S.Ct. 422, 424, 86 L.Ed. 575 (1942). As a result of the fellow-servant rule, the contributory negligence doctrine, and the agreements exempting the railroads from liability, injured railroad employees rarely succeeded in collecting damages from their employers prior to the enactment of FELA.

"Cognizant of the physical dangers of railroading that resulted in the death or maiming of thousands of workers every year, Congress crafted a federal remedy that shifted part of the human overhead of doing business from employees to their employers." *Gottshall*, 512 U.S. at ——, 114 S.Ct. at 2404 (internal quotations omitted). That federal remedy is the Federal Employers' Liability Act (FELA), 45 U.S.C. §§ 51—60.

Under FELA, railroads engaging in interstate commerce are liable in damages to their employees who suffer injury or death in the course of their employment as a result in whole or in part of the negligence of any of the railroad's officers, agents, or employees. 45 U.S.C. § 51. In enacting this federal statutory remedy, Congress eliminated the defenses that had previously barred injured railroad workers from recovering for their injuries. "Specifically, the statute abolished the fellow servant rule, rejected the doctrine of contributory negligence in favor of that of comparative negligence, and prohibited employers from exempting themselves from FELA through contract." *Gottshall*, 512 U.S. at ——, 114 S.Ct. at 2404; *see* 45 U.S.C. §§ 51, 53, 55. In 1939, Congress amended the statute, abolishing the last vestiges of the defense of assumption of the risk. 45 U.S.C. § 54; *see Tiller v. Atlantic Coast Line R.R.*, 318 U.S. 54, 62–64, 63 S.Ct. 444, 448–50, 87 L.Ed. 610 (1943).

The Supreme Court has recognized FELA as a broad remedial statute and has construed FELA liberally in order to accomplish Congress's goals. *Atchison, Topeka & Santa Fe Ry. v. Buell*, 480 U.S. 557, 562, 107 S.Ct. 1410, 1413–14, 94 L.Ed.2d 563 (1987) (citing *Urie v. Thompson*, 337 U.S. 163, 180, 69 S.Ct. 1018, 1029, 93 L.Ed. 1282 (1949)). For example, the Court has held that relaxed standards apply under FELA both for causation, *Rogers v. Missouri Pac. R.R.*, 352 U.S. 500, 506–07, 77 S.Ct. 443, 448–49, 1 L.Ed.2d 493 (1957), and for applying the principle of negligence per se, *Kernan v. American Dredging Co.*, 355 U.S. 426, 438–49, 78 S.Ct. 394, 401–06, 2 L.Ed.2d 382 (1958). The Court has also interpreted the statute as providing a remedy for occupational diseases as well as injuries sustained in accidents, *Urie*, 337 U.S. at 180, 69 S.Ct. at 1029, and has held that claims of negligent infliction of emotional distress are cognizable under FELA, *Gottshall*, 512 U.S. at ——, 114 S.Ct. at 2407.

At the same time, the Court has maintained that FELA does have limitations and must be interpreted "in the appropriate historical context." *Monessen S.W. Ry. v. Morgan*, 486 U.S. 330, 337, 108 S.Ct. 1837, 1843, 100 L.Ed.2d 349 (1988). *See also New York Central R.R. v. Winfield*, 244 U.S. 147,

150, 37 S.Ct. 546, 547, 61 L.Ed. 1045 (1917) (stating that FELA holds carriers responsible for only those injuries resulting from some imputable negligence on their part). In *Monessen*, the Court examined the common law of 1908 and concluded that because prejudgment interest was not available in 1908 and Congress did not attempt to statutorily alter that rule, prejudgment interest was not available under FELA. 486 U.S. at 337–39, 108 S.Ct. at 1843–44. The Court employed the same historical approach in *Gottshall* when it defined the standard for determining liability for claims of negligent infliction of emotional distress. 512 U.S. at ——————, 114 S.Ct. at 2405–11. Thus, although FELA is to be broadly construed, its scope is limited by the historical realities of the time in which it was enacted.

With these principles in mind, as well as the Supreme Court's teachings on preemption, we turn now to the question of whether a railroad can counterclaim under state law for property damages in response to an employee's personal injury claim under FELA.

## C. Analysis

It is settled law that FELA preempts state-law personal injury claims by injured railroad employees against their employers and creates a uniform federal law of liability in this field. *See Winfield*, 244 U.S. at 150, 37 S.Ct. at 547. Nordgren argues, on several levels, that FELA goes beyond the field of personal injury claims to preclude also BN's state-law claim based on its property damage. After careful review of FELA and the common law at the time FELA was enacted, we conclude that FELA does not preclude BN from filing its counterclaim against Nordgren.

We first consider express preemption. Nordgren's argument, and the basis on which the district court denied BN's motion to amend its answer to file the counterclaim, is that FELA expressly preempts the counterclaim. Nordgren points us to § 55 of FELA, which states in relevant part: "Any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to

that extent be void...." 45 U.S.C. § 55. Nordgren argues that the word "device" encompasses a state-law based counterclaim for property damages and thus precludes BN's proposed counterclaim.

Several courts have addressed this precise issue, although their resolution of the question has not been unanimous. Two of our sister circuits, as well as several district courts, have held that "device" does not encompass counterclaims filed by railroads. *See Sprague v. Boston & Maine Corp.*, 769 F.2d 26, 28–29 (1st Cir.1985); *Cavanaugh v. Western Md. Ry.*, 729 F.2d 289, 290–94 (4th Cir.), *cert. denied*, 469 U.S. 872, 105 S.Ct. 222, 83 L.Ed.2d 151 (1984). On the other hand, the Supreme Court of Washington has held that a counterclaim under these circumstances is a "device" because it is intended to limit the railroad's liability under FELA. *Stack v. Chicago, Milwaukee, St. Paul & Pac. R.R.*, 94 Wash.2d 155, 615 P.2d 457, 460 (1980) (en banc).

Our starting point in construing § 55 is the language of the statute itself. *Watt v. Alaska*, 451 U.S. 259, 265, 101 S.Ct. 1673, 1677, 68 L.Ed.2d 80 (1981). "We do not ... construe statutory phrases in isolation; we read statutes as a whole." *United States v. Morton*, 467 U.S. 822, 828, 104 S.Ct. 2769, 2773, 81 L.Ed.2d 680 (1984). Therefore, "in ascertaining the plain meaning of the statute, [we] must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *Sullivan v. Everhart*, 494 U.S. 83, 89, 110 S.Ct. 960, 964, 108 L.Ed.2d 72 (1990).

Nordgren contends that the plain meaning of "any device whatsoever" includes a counterclaim for property damages, because the dictionary defines "device" as a "plan or scheme," as well as a "machine," and because filing a counterclaim is nothing more than a scheme to avoid paying the personal injury damages under FELA. (Appellee's Br. at 10.) While this argument is not wholly without merit, we simply cannot agree that Congress meant "device" to preclude separate causes of action.

Our construction of the phrase "any device whatsoever" is informed by the terms pre-

ceding it—"contract," "rule," and "regulation." All of these terms refer to the legal instruments railroads used prior to the enactment of FELA to exempt themselves from liability. In keeping with those words, then, "any device whatsoever" refers only to any other creative agreements or arrangements the railroad might come up with to exempt itself from liability. Congress's inclusion of this broad, tag-on phrase is not surprising, given the railroads' prior record of exempting themselves from their common-law duties through various legal instruments. *See Duncan,* 315 U.S. at 6, 62 S.Ct. at 424. This phrase does not, however, go so far as to preclude a railroad from attempting to recover under a separate, state-law cause of action for its property damages.

■ Moreover, the words "any device whatsoever" are also defined by the phrase that follows them, "the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter." 45 U.S.C. § 55. Thus, only when something exempts the railroad from FELA liability can it be a device. *See Cavanaugh,* 729 F.2d at 292. Simply stated, the problem with calling BN's proposed counterclaim a "device" under § 55 is that its use does not exempt the railroad from FELA liability; BN could still be found liable to Nordgren on his FELA claim.[2] Considering the phrase "any device whatsoever" in context, we conclude that its plain meaning does not encompass a railroad's common-law based counterclaim for property damages.[3]

The Supreme Court's discussions concerning the scope of § 55 support our conclusion. In *Philadelphia, B. & W. R.R. v. Schubert,*

224 U.S. 603, 611, 32 S.Ct. 589, 591, 56 L.Ed. 911 (1912), the Court explained how Congress had rejected an earlier, more restrictively termed provision in favor of § 55 as enacted in 1908. The Court stated, "The evident purpose of Congress was to enlarge the scope of the section and to make it more comprehensive by a generic, rather than a specific, description.... [The language 'any contract, rule, regulation, or device whatsoever'] includes every variety of agreement or arrangement of this nature...." *Id.* This discussion presupposes that § 55 is aimed at voiding creative instruments meant to exempt carriers from liability.

■ In *Duncan v. Thompson,* the Court again operated under the assumption that § 55 is directed at the various kinds of agreements or instruments the railroads might create to exempt themselves from liability. 315 U.S. at 6, 62 S.Ct. at 424. The Court relied on *Schubert* and further explained the legislative history of § 55. *Id.* at 4, 62 S.Ct. at 423. Nothing in the discussion of this case or the legislative history it relies on supports the proposition that Congress intended "any device whatsoever" to include a state-law based counterclaim for property damages.[4] We therefore find no express preemption of BN's state-law counterclaim.

■ We further find no field preemption in this case. To impliedly preempt a field, Congress must create a scheme of regulation so pervasive one could reasonably infer that Congress intended to occupy the field completely, leaving no room for supplemental state law. *Fidelity Fed. Sav. & Loan Ass'n,*

**2.** Nothing about the existence of the counterclaim works to exempt BN from its FELA-imposed liability. Its counterclaim exists as a separate claim authorized arguably by the common law of Minnesota.

**3.** We note that if we were to construe this language otherwise, the analysis would be further complicated by Federal Rule of Civil Procedure 13(a), which requires a defendant to plead as a compulsory counterclaim any claim the defendant may have arising "out of the same transaction or occurrence that is the subject matter of the [plaintiff's] claim." If FELA preempts BN's counterclaim, while Rule 13(a) prohibits bringing the claim except as a counterclaim, constitu-

tional concerns may arise regarding the railroad's due process rights. Given our resolution of the question before us, however, we need not express an opinion on the Rule 13(a) ramifications of Nordgren's argument.

**4.** In a similar vein, we conclude that § 60 of FELA does not preclude BN's counterclaim. This section declares void "any contract, rule, regulation or device whatsoever" that prevents railroad employees from voluntarily furnishing information to an injured railroad employee, or his representative, with respect to the facts incident to the injury. We find the language "any ... device whatsoever" in § 60 is limited in the same way that it is limited in § 55.

458 U.S. at 153, 102 S.Ct. at 3022. It is clear that Congress manifestly intended to occupy the field of recovery for personal injuries to railroad employees incurred in the course of employment when it enacted FELA. *See Winfield*, 244 U.S. at 152, 37 S.Ct. at 548. Property damage claims fall outside of this preempted field, because they protect an entirely different interest and arise independently of any liability under FELA.

We are left then with conflict preemption. The branch of conflict preemption that applies where it is impossible for a party to comply with both federal and state law is not at issue here. As noted, Nordgren's FELA claim runs separately from BN's proposed counterclaim, and the two causes of action arise from independent but compatible duties.[5] The second branch of conflict preemption, where a state law " 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' " *Freightliner Corp.*, —— U.S. at ——, 115 S.Ct. at 1487 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)), is at issue, however.

Nordgren argues that preemption exists here because BN's proposed counterclaim frustrates the purposes of FELA. In answer to BN's argument that Congress's silence reveals an intent not to preempt the railroad's counterclaim, Nordgren replies that Congress was silent with respect to a railroad's potential property damage claims because contributory negligence barred any recovery under the states' law in 1908. Nordgren argues that a recent development in state law—the rejection of contributory negligence in favor of comparative fault—has created the opportunity for railroads to recover property damages where they could not have when Congress enacted FELA. He points to the reality that a railroad's counterclaim for property damages may dwarf an employee's personal injury claim under FELA, and argues that to allow such coun-

terclaims to swallow up the injured employee's FELA award is to allow railroads to frustrate the broad remedial purposes of FELA.

We recognize the unfortunate reality from the employee's view that a railroad's claim for property damages may greatly exceed the employee's personal injury claim arising out of the same incident. Accordingly, Nordgren's argument would have considerable weight if contributory negligence had acted as a total bar to a railroad's recovery of property damages when FELA was enacted, because we presume Congress was aware of the established rules of law at the time it enacted FELA. *See Wood v. Commissioner of Internal Revenue*, 909 F.2d 1155, 1160 (8th Cir.1990). Nordgren's picture of the law of 1908, however, is incomplete, and we conclude that the state-law adoption of comparative fault has not had the far reaching effects Nordgren advances.

In 1908, as a general matter, and with some nuances in the law, masters could sue their servants for property damages caused by the servants' negligence. As Nordgren submits, the doctrine of contributory negligence did apply to these suits, acting as a bar if the master himself was negligent. *See, e.g., Sioux City & P.R. Co. v. Walker*, 49 Iowa 273, 277–78 (1878); *Brant v. Gallup*, 111 Ill. 487, 497 (1885). However, if a second servant's negligence (rather than that of the master himself) helped cause the property damages, courts generally refused to impute the second servant's negligence to the master to bar the master's claim against the first servant. *See, e.g., T. & P. Ry. v. Hurless*, 1 Tex. Civ. Cas. 306 (Tex.Ct.App.1882); *Mobile & M. Ry. v. Clanton*, 59 Ala. 392, 397 (1877); *Zulkee v. Wing*, 20 Wis. 408, 409–10 (1866). Therefore, absent negligence of the master himself, the doctrine of contributory negligence did not bar the recovery of a master who sued a servant for negligence.[6]

---

5. BN's duty towards Nordgren is accounted for in Nordgren's FELA suit, while Nordgren's separate duty to BN is accounted for in the proposed counterclaim. Each owes a distinct duty to the other, and both have injury allegedly caused, in whole or in part, by the other.

6. These common-law rules for a master's claim against his servant for property damages have remained essentially intact throughout this century. *See, e.g., Oxford Shipping Co. v. New Hampshire Trading Corp.*, 697 F.2d 1, 6 (1st Cir.1982) (refusing to impute second servant's negligence to master in order to apply contribu-

■ Given the common-law rule in existence in 1908 that a second servant's negligence could not be imputed to the master (and therefore would not bar a railroad's recovery of property damage from the first servant), we respectfully disagree with Nordgren's premise that the adoption of comparative fault has significantly affected the railroads' ability to recover property damages from a negligent employee. Considering that the law at the time FELA was enacted did not preclude railroads from recovering property damages, and the fact that Congress never purported to affect the railroads' recovery, we will not infer conflict preemption merely because, after all is said and done, the property damage award might be greater than the FELA award. We presume a statute "to be harmonious with existing law" "absent a clear manifestation of contrary intent." *Wood*, 909 F.2d at 1160 (internal quotations omitted). Accordingly, we find no conflict preemption by FELA of BN's proposed state-law counterclaim for property damages.[7]

We do not decide this case with a blind eye toward the policy considerations ably argued by Nordgren and explained quite eloquently by the dissenting judge in *Cavanaugh*, 729 F.2d at 289. We are not legislators, however, and in our view, Congress's silence on this issue speaks volumes. We therefore hold that FELA does not preempt BN's counterclaim for property damages.

### III.

For the reasons outlined above, we reverse the order of the district court and remand for further proceedings consistent with this opinion.

McMILLIAN, Circuit Judge, dissenting.

I respectfully dissent. For the reasons discussed below, I would hold that the FELA prohibits railroads from asserting claims against employees for negligently causing property damage. I agree with the majority opinion that the FELA must be interpreted in the appropriate historical context. However, in my view, the appropriate historical context does not support the railroads' property damage counterclaims. In addition, I would hold that the railroads' property damage counterclaims are "devices" within the meaning of both 45 U.S.C. § 55 and 45 U.S.C. § 60. These conclusions are based upon the persuasive analysis set forth in a law review article, William P. Murphy, *Sidetracking the FELA: The Railroads' Property Damage Claims*, 69 Minn. L.Rev. 349 (1985) (hereinafter cited as *Sidetracking*).

Railroads' property damage counterclaims are not expressly addressed by the FELA. However, Mr. Murphy persuasively demonstrates that, when viewed in the appropriate historical context, Congress by its silence did not intend to allow such claims.

Early case law indicates that the common law only tentatively embraced an employer's right to proceed against an employee for negligently caused property damage. Such actions certainly did not have the prominence of common law defenses such as contributory negligence, assumption of the risk, or fellow servant negligence. Usually, the employer was

---

tory negligence bar to master's claim against negligent first servant); *Buhl v. Viera*, 328 Mass. 201, 102 N.E.2d 774, 775 (1952) (refusing to bar recovery by the principal against an agent by imputing to principal contributory negligence of second agent). *But see Capitola v. Minneapolis, St. Paul, & Sault Ste. Marie R.R.*, 258 Minn. 206, 103 N.W.2d 867, 869 (1960) (holding that contributory negligence of one employee may be imputed to an employer to bar the employer's claim for damages against another employee).

7. The dissent argues that, in 1908, an employer's claim for property damages against an employee was "contractual, defensive, and limited to setoffs" against the employee's claim for wages.

*See post* at 1254. Thus, the dissent concludes, property damage claims against employees did not exist as we know them today, and Congress's silence should be construed to support Nordgren's theory of preemption.

We respectfully disagree. Our research shows that the setoff sought by the railroads was based on the employees' negligence. *See Georgia S. & F. Ry. v. Jossey*, 105 Ga. 271, 31 S.E. 179 (1898); *Hurless*, 1 Tex. Civ. Cas. at 306. Further, we are not surprised by the fact that the pre-FELA cases predominately involve employers' counterclaims in response to employees' claims for wages, rather than for personal injuries. As explained above, employees were generally unsuccessful in their attempts to recover for personal injuries.

limited to the defensive benefit of setting off some amount against the employee's recovery in a suit for wages. . . .

Cases suggesting that an employer could recover affirmatively from an employee for negligently caused property damage typically introduce statutes or rules that go beyond the common law in protecting the interests of employers. . . .

. . . .

The employer's property damage claim, therefore, was contextually limited in pre-FELA common law. Even assuming that Congress was aware of these cases, it could not anticipate that such claims, raised exclusively in employees' suits for wages and often influenced by state statutes, would expand into a defensive action in employees' suits for injury and death. As a purely procedural matter, Congress had little reason to expect in 1906 [when the FELA was first enacted] and 1908 [when the FELA was reenacted] that setoffs sounding in assumpsit could be raised against injured workers suing in trespass on the case. Moreover, the prevalence of the contributory negligence bar in pre-FELA common law also explains Congress's failure to enact an express prohibition of employers' property damage counterclaims in FELA suits. If the FELA plaintiff proved that *any* employer negligence contributed to the employee's injury or death, common law presumably would bar the employer's property damage claim. . . .

. . . Historical analysis proves that employer claims raised under pre-FELA common law differed significantly from those presently asserted by railroads.

*Id.* at 367–71 (footnotes omitted). Thus, in 1908 employers' property damage claims were contractual in nature, defensive, and limited to setoffs.

The Federal Rules of Civil Procedure cannot supply the answer to the question. Fed. R.Civ.P. 13(a) requires a defendant to plead all claims the defendant may have against the opposing party arising out of the same transaction or occurrence. The majority in *Cavanaugh v. Western Maryland Ry.*, 729 F.2d 289, 291 (4th Cir.) (*Cavanaugh*), cert.

denied, 469 U.S. 872, 105 S.Ct. 222, 83 L.Ed.2d 151 (1984), concluded that it would be unfair to bar the railroads from filing compulsory counterclaims for property damage.

Barring the counterclaim, however, would be "unfair" only if the FELA, in conjunction with the supremacy clause of the constitution, otherwise permitted the railroad's claim. Since the Federal Rules of Civil Procedure "shall not abridge, enlarge or modify any substantive right," 28 U.S.C. § 2072 (1982), Rule 13(a) obviously does not *create* any right of action in the railroad for property damage negligently caused by a railroad worker. Instead, the inquiry must be whether a state law cause of action such as that asserted in *Cavanaugh* exists at all and, if so, whether it nevertheless has been superseded by virtue of the supremacy of the FELA over any state law that conflicts or interferes with its terms of policies.

*Sidetracking,* 69 Minn. L.Rev. at 365 n. 72; *see also id.* at 383 n. 147 (suggesting that Rule 13(a) could fall within the prohibition against "rules" contained in the "no contract-no device" prohibition in 45 U.S.C. § 55).

Mr. Murphy also demonstrates how railroads' property damage claims would frustrate the remedial purpose of the FELA by examining the effect of such claims on the FELA comparative negligence section, 45 U.S.C. § 53.

[The comparative negligence provision] was added in 1908, replacing the prior qualified contributory negligence bar. . . . Imposing liability on the railroad in proportion to its own negligence and that of other workers was intended to encourage railroad safety. In this balance, reducing the FELA award in proportion to the injured worker's negligence was a "sufficient" burden for the employee to bear.

To illustrate the disruption to this balance that occurs when an FELA defendant railroad counterclaims for property damage, consider the situation in which an injured worker and the railroad are both fifty percent negligent and the jury assesses damages for the employee's injury at $500,000. In the absence of a property

damage counterclaim, the injured worker would recover half of $500,000, or $250,000, from the railroad. A radically different result occurs, however, if the railroad asserts and proves that the same negligence resulted in $500,000 in property damage. Even if the applicable state comparative negligence law reduces the railroad's recovery in proportion to its own negligence, the property damage claim offsets the FELA recovery.

Assuming the same damage figures, in a case in which a plaintiff is fifty percent negligent and proves that a co-worker also is fifty percent negligent, the plaintiff's recovery on the FELA claim once again would be $250,000. If the state law under which a property damage counterclaim arises recognizes joint and several liability, however, the railroad may be legally entitled to obtain full recovery of its $500,000 property loss from the FELA plaintiff. This occurs if state law prohibits imputing the negligence of an employee to the employer when the employer raises its own claim. The employer's judgment against the FELA plaintiff, of course, would probably be satisfied only to the extent of the plaintiff's recovery against the railroad; that recovery is exactly what made the FELA plaintiff vulnerable to an enforceable judgment. Because the negligent co-worker has achieved no recovery, any rights of contribution possessed by the FELA plaintiff against the co-worker would be of little value....

*Sidetracking,* 69 Minn. L.Rev. at 373–75 (footnotes omitted).

Railroads' property damage counterclaims are also incompatible with the safety acts provision in the comparative negligence section. That provision provides that "no such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee." 45 U.S.C. § 53.

This prohibition against considering the worker's negligence, of course, would not apply to a purely state law property damage claim. Such a claim consequently could offset the FELA recovery of a contributorily negligent worker even if the railroad violated a safety statute. This result directly conflicts with Congress's firm intention to prevent railroads from escaping FELA liability when the violation of a safety statute contributed to the worker's injury or death and squarely defeats the railroads' statutory incentive to comply with safety acts.

*Sidetracking,* 69 Minn. L.Rev. at 375.

In addition, railroads' property damage claims could interfere with the employee's choice of forum. This is because railroads are not limited to raising property damage claims as counterclaims.

[R]ailroads could file property damage claims in separate state law actions. Indeed, the three-year FELA statute of limitations [45 U.S.C. § 56] may induce railroads facing shorter limitations periods for their state claims to initiate first strikes. [T]he disposition of such state law claims could bar later FELA suits under the principles of res judicata and collateral estoppel to the extent that the state courts themselves would apply those doctrines in a subsequent action brought in state court.

More practically, a railroad's first filing could force the prospective FELA plaintiff to raise the FELA as a counterclaim to the railroad's state law action to prevent the preclusion of the FELA claim. Such defense actions could occur whether the railroad filed in state court or in federal court. Regardless of the railroad's filing situs, Congress's intention to permit FELA plaintiffs to choose the legal forum would be soundly defeated. On the one hand, if the employer files first in federal court, the congressional aim, embodied in the FELA's removal prohibition [28 U.S.C. § 1445(a) ], to permit FELA claimants to litigate in state courts if they so desire is thwarted. On the other hand, if a nondiverse employer files first in state court, no generally accepted principle permits the FELA counterclaimant to remove the action to federal court.

*Id.* at 375–76 (footnotes omitted).

Mr. Murphy next demonstrates that the term "device" in 45 U.S.C. § 55 (and 45

U.S.C. § 60) covers, and bars, railroads' property damage counterclaims in FELA actions.

In reaction to the railroads' growing practice of obtaining contractual exoneration from liability to employees injured or killed in railroad accidents, Congress expressly admonished in the 1906 FELA that "no contract of employment, insurance, relief benefit, or indemnity for injury or death ... shall constitute any *bar or defense* to any [FELA] action." This provision guarded railroad workers against a multitude of threats to FELA recoveries. By preventing contract-related bars or defenses from having any judicial effect on the FELA's liability design, Congress protected its interest in compensating employees and their families for injury and death and in encouraging railroad safety improvements. The breadth of matters condemned in this "no contract" section evidences Congress's intent to prohibit all known and potential liability-avoidance techniques permitted under common law.

By its very terms, this 1906 prohibition superseded any common law right of employers to assert property damage counterclaims in employees' personal injury actions. [E]mployers asserted pre-FELA property damage claims exclusively as set-offs, recoupments, or counterclaims in employees' suits for wages. Court decisions examining the common law basis of these claims agreed on one essential point: the employer's claim derived from the employment contract. At this stage of common law development, Congress could anticipate, at most, that courts also would characterize any similar claims asserted in employees' personal injury suits as contract defenses, and it provided for such contingencies by banning all contract bars and defenses in FELA suits.

In the 1908 FELA reenactment, Congress extended the "no contract" prohibition to include "[a]ny contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any [FELA] liability." [45 U.S.C. § 55] Although this section no longer contained the 1906 provision's "bar or defense" language,

Congress could not have intended to reinstate contractual bars and defenses to FELA liability. On the contrary, Congress sought to expand the prohibitions beyond those expressed in 1906. The 1906 prohibition of contract-related defenses thus was reasserted in the 1908 "no contract-no device" provision, albeit in slightly different language.

The majority in *Cavanaugh*, in holding that the "contract ... or device" language did not prohibit a railroad's property damage counterclaim, failed to recognize that the closest ancestor of the modern property damage counterclaim in pre-FELA common law was rooted in contract. Rather, the court held that "device" referred only to the attempts of railroads to "exempt" or excuse themselves from liability and that "a counterclaim by the railroad for its own damages is plainly not an 'exempt[ion] ... from any liability' and is thus not a 'device' within the contemplation of Congress." [729 F.2d at 292] Under this algebraic analysis, however, neither are most contracts, rules, and regulations "exemptions" even though they preclude employee compensation and eliminate the liability incentive for safety improvements.

An even more basic flaw in the *Cavanaugh* court's reasoning is the assumption that Congress intended to prohibit only those "devices" within its immediate contemplation. By adding the "[a]ny ... device whatsoever" clause, Congress attempted to bar all *future* creative defenses that common law might otherwise permit to defeat railroads' FELA liability. To accomplish this purpose, Congress adopted the broadest and most open-ended language possible. . . .

The FELA's 1939 amendments reinforce the necessity of interpreting the "no contract-no device" prohibition to apply to the railroads' property damage counterclaims. The amendments resulted from congressional frustration with courts' applying the assumption of risk defense when railroads had issued a general notice of unsafe conditions. In reaction to these "aggressions of courts," Congress abolished the common law assumption of risk defense in FELA

actions. [45 U.S.C. § 54] The House Judiciary Committee report, however, maintained that the amendment was unnecessary because the defense already was barred by the "no contract-no device" provision: "[S]uch a scheme of charging notice is a device to escape liability.... [T]he prohibition of devices, regulations, and so forth, to defeat liability covers a subject matter outside of relief associations, against which the provisions ... were mainly directed."

The 1939 [House] Judiciary Committee report thus confirms that Congress intended the 1908 "no contract-no device" provision to prohibit FELA defenses not yet envisioned.

*Sidetracking,* 69 Minn. L.Rev. at 380–82 (emphasis added to statutory quotation; footnotes omitted).

Mr. Murphy further supports his analysis of the inclusiveness of the term "device" in 45 U.S.C. § 55 by noting that the section's "sole exception ... allows a railroad to set off its contributions to insurance designed to compensate workers for injury or death." *Sidetracking,* 69 Minn. L.Rev. at 383 (footnote omitted).

First, the setoff exception is purposeless if, as the court in *Cavanaugh* maintained, the prohibition itself applies only to technical exemptions from liability and not to setoffs. Second, Congress's exclusion of one specific setoff from the "no contract-no device" prohibition implies that Congress did not intend to except other forms of setoff, including the common law equivalent of counterclaim, from the prohibition's scope.

The court in *Cavanaugh* maintained that the "no contract-no device" prohibition applies only to contracts and devices that permit railroads to "exempt" themselves from FELA liability. By this view, a railroad's counterclaim falls outside the prohibition because it does not prevent finding the railroad liable on the FELA claim; it affects only the amount of damages the FELA plaintiff can recover from the railroad. Neither does a railroad's claim for setoff seek to exempt the railroad from FELA liability, however, since it also

merely permits the railroad to reduce the plaintiff's recovery. Thus, under the Cavanaugh analysis, Congress had no need to exclude railroad setoffs for contributions to insurance and other compensatory benefits from the "no contract-no device" prohibition. All setoff claims were already excluded. Congress nonetheless did adopt the narrow setoff exception to the 1906 "no contract" prohibition and the 1908 "no contract-no device" prohibition because it apparently believed that a specific exclusion for a limited setoff was necessary to avoid the operation of the prohibition. The setoff exception thus implies a result opposite to that reached under the *Cavanaugh* analysis: *all* setoffs are prohibited under the "no contract-no device" provision unless otherwise excepted.

*Id.* at 383 (footnotes omitted).

Finally, Mr. Murphy also demonstrates that railroads' property damage claims are fundamentally incompatible with another section of the FELA, 45 U.S.C. § 60, because "such claims may inhibit co-workers [of the FELA plaintiff] from volunteering information necessary to establish an FELA suit." *Sidetracking,* 69 Minn. L.Rev. at 386.

The FELA, even though conceived as remedial legislation, is still grounded on the plaintiff's ability to prove at least some negligence by the railroad or co-workers. Some very practical consequences flow from this requirement. A worker not mortally injured may be able to testify regarding railroad or co-worker negligence. When the employee has not personal knowledge or died as a result of the accident, however, the FELA plaintiff must investigate the accident independently to obtain much of the necessary proof. The FELA plaintiff is rarely as equipped to conduct an immediate inquiry as is the railroad. Consequently, the evidence may become stale and the accident difficult or impossible to reconstruct. In these circumstances, information from co-workers is essential for the plaintiff to prevail in the FELA action. If the railroad, in keeping its own investigatory files confidential, creates the impression that it might retaliate against co-workers who admit their

own negligence or testify as to railroad negligence, the likelihood of a full and effective investigation by the FELA plaintiff diminishes significantly.

Although the 1906 and 1908 versions of the FELA contained no provisions ensuring plaintiffs free access to co-worker information, by 1939 Congress had recognized that the threatening practices of railroads could suppress the free flow of information from co-workers to parties interested in seeking FELA remedies. Although the resulting FELA amendment did not compel employees to provide information or eliminate railroads' privilege with respect to their investigatory files, the amendment is remarkable for its attempt to anticipate and prohibit all railroad maneuvers designed to inhibit free access to information:

> Any contract, rule, regulation, or *device whatsoever*, the purpose, intent, or *effect* of which shall be to prevent employees of any common carrier from furnishing voluntarily information to a person in interest as to the facts incident to the injury or death of any employee, *shall be void*, and whoever, by threat, intimidation, order, rule, contract, regulation, or *device whatsoever*, shall attempt to prevent any person from furnishing voluntarily such information to a person in interest, or whoever discharges or otherwise disciplines or attempts to discipline any employee for furnishing voluntarily such information to a person in interest, [shall be punished by fine or imprisonment].

This "free access" guarantee thus should bar railroad property damage claims against co-workers when such claims are deemed to be "devices" having the *effect* of preventing employees from volunteering information to parties interested in pursuing and maintaining FELA suits.

. . . .

For any arguably negligent worker, the risk of supplying information is the risk of complete financial disaster. When a worker furnishes evidence of personal negligence to anyone interested in pursuing an FELA action, the worker may be furnish-ing evidence on which the railroad could base a property damage claim. Even worker-witnesses who believe themselves free of negligence would risk suffering retaliatory charges of negligence and railroad property damage suits. The "common law" property damage claim, however doubtful its heredity, would prevent the very flow of co-worker information supposedly protected by the "free access" guarantee.

*Id.* at 386–89 (emphasis added to statutory quotation; footnotes omitted); *cf. Stack v. Chicago, Milwaukee, St. Paul & Pacific R.R.*, 94 Wash.2d 155, 158–60, 615 P.2d 457, 459–60 (1980) (banc) (railroad impleaded surviving crew members; court barred impleader as chilling FELA "free access" guarantee; Murphy argues offending "device" was not impleader of third party defendants into FELA suit but property damage cause of action itself).

In sum, I am persuaded by Mr. Murphy's analysis that in 1908 the common law did not allow railroads' property damage counterclaims and that, even assuming the common law did so, such claims, whether filed as counterclaims or brought as separate actions, are preempted by the FELA's statutory language and are fundamentally incompatible with its remedial purpose.