**Joey Scott LUMAN, Appellant,**

v.

**ITS TECHNOLOGIES & LOGISTICS, LLC, Respondent.**

**No. WD 72010.**

Missouri Court of Appeals, Western District.

Sept. 28, 2010.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 2, 2010.

John M. Cronan, Overland Park, KS, for Appellant.

David R. Schlee, Kansas City, MO, for Respondent.

Before: VICTOR C. HOWARD, P.J., THOMAS H. NEWTON, and GARY D. WITT, JJ.

THOMAS H. NEWTON, Judge.

Mr. Joey Scott Luman appeals the trial court's judgment dismissing his personal injury suit against ITS Technologies & Logistics, LLC ("ITS") and finding that Missouri Workers' Compensation Law, RSMo section 287.010, *et seq.*, ("Workers' Compensation") governed the action. Mr. Luman contends his claim was governed by the Federal Employer's Liability Act ("FELA"), 45 U.S.C. § 51 *et seq.* We reverse and remand.

**Factual and Procedural Background**

ITS provides switching, terminal, and maintenance service at the Richards–Gebaur International Freight Center ("Richards–Gebaur") for Kansas City Southern Railway Company ("KC Southern"). In May 2008, Mr. Luman, a Terminal Operator for ITS, was operating a switch engine at Richards–Gebaur when it was struck by a train operated by KC Southern employees.

Mr. Luman brought a personal injury action against ITS and KC Southern and subsequently settled with KC Southern. In the petition, Mr. Luman asserted that FELA governed his claim against ITS. He filed a motion for partial summary judgment on the issue of FELA's applicability to the claim. ITS also moved for summary judgment, or in the alternative to dismiss for lack of subject matter jurisdiction. It argued, *inter alia,* that it was not a "common carrier" under FELA, the trial court did not have jurisdiction because Missouri Workers' Compensation Law ("Workers' Compensation") provided Mr. Luman's exclusive remedy, and Mr. Luman was estopped from suit because he had accepted Workers' Compensation benefits. In its answer, ITS further denied FELA was applicable and raised as an affirmative defense that Workers' Compensation provided Mr. Luman's exclusive remedy.

On November 16, 2009, the trial court issued an order and memorandum. In its findings, the trial court concluded that if FELA applied to Mr. Luman's claim, the receipt of benefits would not estop him from proceeding with the FELA claim, in part because the Workers' Compensation benefits could be recouped from any FELA award. The trial court further found that ITS was not a "common carrier" for FELA purposes and concluded that FELA did not apply. The trial court denied Mr. Luman's motion for partial summary judgment, and though it did not expressly so hold, effectively granted ITS's competing motion for summary judgment insofar as it claimed ITS was not a "common carrier" under FELA.[1] The trial court then granted ITS's motion to dismiss, finding that it lacked subject matter jurisdiction because Mr. Luman's injury was covered by Workers' Compensation. Mr. Luman appeals and argues that the trial court erred in dismissing the suit because it was governed by FELA rather than by Workers' Compensation.[2]

---

1. The trial court's determination that ITS was not a "common carrier" necessarily required it to weigh factual allegations. It appears the facts relied on by the trial court to support its conclusion were not contested, and neither party contends to the contrary on appeal.

2. Mr. Luman raises a second point contending that his receipt of Workers' Compensation benefits did not preclude the claim. However, there is no point of error for us to review because the trial court agreed with Mr. Luman, finding that if Mr. Luman had a claim under FELA, the receipt of workers' compen-

## Standard of Review

Though the trial court, having found that FELA did not apply, dismissed Mr. Luman's claim for lack of subject matter jurisdiction, we concluded in *Fortenberry v. Buck* that where the exclusivity of Workers' Compensation is raised as a defense, a trial court must employ the more rigorous summary judgment standard to a request for dismissal. 307 S.W.3d 676, 679 (Mo.App. W.D.2010). We can, in this case, overlook the trial court's technical error as it is evident from the collective orders of the trial court that the decision to dismiss Mr. Luman's claim because it was covered exclusively by Workers' Compensation naturally followed the trial court's application of the proper standard to both Mr. Luman's and ITS's competing motions for summary judgment regarding the application of FELA. Thus, the central issue in determining whether the trial court properly dismissed Mr. Luman's claim is whether the trial court properly concluded, as a matter of law, that based on the apparent uncontested facts before it, FELA was not applicable because ITS was not a "common carrier."

■ Whether FELA applies to Mr. Luman's claim is ultimately a question of preemption. *See Nordgren v. Burlington N.R.R. Co.,* 101 F.3d 1246, 1248 (8th Cir. 1996). To determine if Congress has exercised its power under the Supremacy Clause to preempt a state cause of action, we must look to congressional intent. *Id.* We determine Congress's intent from the language expressed in the statute. *Stegall*

*v. Peoples Bank of Cuba,* 270 S.W.3d 500, 503 (Mo.App. S.D.2008). To determine the applicability of FELA, we engage in statutory interpretation, which raises a question of law that requires *de novo* review. *Id.* FELA is a remedial statute, and we are to construe it liberally. *Nordgren,* 101 F.3d at 1249.

### Applicability of FELA to Mr. Luman's Claim

■ To determine FELA's scope, we look to its purposes, background, and the construction given to it by the U.S. Supreme Court. *Id.* at 1248. Prior to FELA's enactment in 1908, a railroad employee's recourse for the negligence of a fellow employee was significantly limited by common law doctrines and contractual employment agreements. *Id.* at 1248–49. In FELA, Congress sought to shift the burden of railroading's physical hazards from employees to their employers by limiting the applicability of these doctrines and barring employers from exempting themselves from liability through contract. *Id.* at 1249. Thus, "[u]nder FELA, railroads engaging in interstate commerce are liable in damages to their employees who suffer injury or death in the course of their employment as a result in whole or in part of the negligence of any of the railroad's officers, agents, or employees." *Id.* (citing 45 U.S.C. § 51). FELA further preempts an injured railroad employee's state-law personal injury claims, creating a "uniform federal law of liability." *Id.* at 1250, 1252.[3]

---

sation benefits would not have estopped him from proceeding. *See Bailey v. Mo.-Ks.-Tex. R.R.,* 732 S.W.2d 248, 249 n. 2 (Mo.App. E.D.1987).

3. Missouri Workers' Compensation provides that it applies to all cases falling within its provisions "except those exclusively covered by any federal law.' " *Augur v. Norfolk S. Ry.*

*Co.,* 154 S.W.3d 510, 515 (Mo.App. W.D.2005) (quoting § 287.110.1). Although Missouri provides that an employer subject to Workers' Compensation includes " 'any person or corporation operating a railroad,' " it thus exempts those injuries covered by FELA. *Id.* (quoting § 287.030.1(1)).

■ FELA does not apply to all railroad enterprises: it specifically provides liability for "common carrier[s] by railroad engaged in interstate commerce." *Edwards v. Pac. Fruit Express Co.*, 390 U.S. 538, 538–39, 88 S.Ct. 1239, 20 L.Ed.2d 112 (1968); 45 U.S.C. § 51. A "common carrier" has been defined as:

> one who holds himself out to the public as engaged in the business of transportation of person or property from place to place for compensation, offering his services to the public generally. The distinctive characteristic of a common carrier is that he undertakes to carry for all people indifferently, and hence is regarded in some respects as a public servant.

*Lone Star Steel Co. v. McGee*, 380 F.2d 640, 643 (5th Cir.1967), *cert. denied*, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 471 (1967) (internal citation and quotation marks omitted). Common carriers are distinguished from private carriers: a common carrier is impliedly one who is engaged in the business of transportation for anyone who wishes to use the service, while a private carrier renders rail service only for certain people or certain businesses. *Id.* at 645.

■ Relying on *Lone Star* and *Greene v. Long Island Railroad Co.*, 280 F.3d 224, 235–36 (2d Cir.2002), Mr. Luman argues that ITS is a "common carrier by railroad engaged in interstate commerce" because of its integral relationship with KC Southern. The parties' documents and pleadings show the following undisputed facts relating to the relationship between ITS and KC Southern.

KC Southern owns and operates the tracks at Richards–Gebaur. As part of its intermodal freight service for its customers, KC Southern crews bring and take away railcars from the switching yard. At the switching yard, ITS unloads and reloads automobiles and shipping containers from the railcars for further transport by KC Southern and "makes up" trains for KC Southern's outbound routes. Under the two companies' "Terminal Services and Maintenance Agreement" ITS also provides support and administrative services, including the janitorial and trash removal at Richards–Gebaur. In addition to those services described, under the "Switching Agreement" ITS provides the lift equipment and "hostlers" used by its employees to load and unload the railcars and the switch engines for its switching service. ITS also switches empty railcars to specific tracks so that KC Southern crews can move them to other rail terminals. At the time of the injury, Mr. Luman was using an ITS switch engine to move an empty railcar to make way for an incoming train.

Mr. Luman highlights that the Terminal and Services Maintenance Agreement further provides that: (1) personnel supervision is to be consistent with KC Southern policy; (2) ITS's records of operation of the facility will be available to KC Southern; (3) KC Southern is given contractual authority to direct ITS's lift operation, provision of related services, and operating hours; and (4) vehicle operation by ITS employees must conform to KC Southern rules. The Switching Agreement also provides that ITS will provide switching at KC Southern's request, furnish switching reports, and allow KC Southern to examine its related books and records.

Mr. Luman relies on *Lone Star* to argue that these facts show ITS was a common carrier through its relationship with KC Southern. In *Lone Star*, the employee of a steel producer was injured while switching trains within its in-plant rail facility. 380 F.2d at 641. The Fifth Circuit found that Lone Star Steel was a common carrier under FELA through its integral relation with a common carrier in interstate

commerce. *Id.* at 642. Because Lone Star Steel was "a necessary part of [the carrier's] total rail operation" and undertook the carrier's obligations as a common carrier, Lone Star Steel could not claim to be a private carrier. *Id.* at 646. The *Lone Star* court set forth factors it believed were of "prime importance" in making this determination: (1) "the actual performance of rail service"; (2) the service is performed as part of a total rail service contracted for by a member of the public; (3) the service is performed as part of an interstate rail system by virtue of a relationship with a railroad, either through common ownership or by contract; and (4) the entity receives remuneration for the services. *Id.* at 647.

In accord with these factors, Mr. Luman argues: (1) he was injured while performing rail service by moving a railcar; (2) he was moving the railcar to make room for in-bound trains, which was "a part of the total services contracted for by members of the public in their business relationship" with KC Southern; (3) that his work was part of KC Southern's overall system of interstate rail transportation in which ITS and Mr. Luman participated because of their contractual relationship; and (4) that ITS received remuneration.

The trial court, while acknowledging the factors cited in *Lone Star*, concluded ITS was not a common carrier because: (1) ITS was KC Southern's independent contractor; (2) ITS only performed switching on tracks located at Richards–Gebaur; (3) ITS did not move railcars across state lines; and (4) KC Southern and ITS did not have financial interests in each other. We do not find these factors conclusive.

■■■■ As previously mentioned, we look to Congressional intent to determine whether FELA applies to the employer at issue. *United States v. Brooklyn E. Dist. Terminal,* 249 U.S. 296, 304, 39 S.Ct. 283,

63 L.Ed. 613 (1919). Through FELA, Congress sought to liberalize recovery for railroad employees due to the hazards of the industry. *Nordgren,* 101 F.3d at 1249. Consequently, a railroad company may not avoid FELA liability by delegating its duties to an independent contractor. *Eddings v. Collins Pine Co.,* 140 F.Supp. 622, 629 (D.C.Cal.1956). This conclusion, however, "does not and should not limit the responsibility of [the contractor] under both the contract and practices followed." *Id.* To hold the railroad company liable while excusing the independent contractor performing essential railroad operations would frustrate "[t]he beneficent and humane purposes of the Act ... by denying relief to employees in interstate commerce who were actually carrying on the railroad functions." *Id.; see also Greene,* 280 F.3d at 235 ("Even the fact that a company 'conducts [such] operations, not as an integral part of a single railroad system but wholly as an agent for one or several,' does not exempt it from the status of common carrier." (quoting *Brooklyn,* 249 U.S. at 305, 39 S.Ct. 283)).

■■■■ Rather, as the case law aptly demonstrates, whether an entity is a common carrier depends "upon what it does." *Brooklyn,* 249 U.S. at 304, 39 S.Ct. 283. Where the work performed by a contractor is essential to the railroad's operations as a common carrier, the contractor falls within FELA. *See Erie R.R. Co. v. Margue,* 23 F.2d 664, 665 (6th Cir.1928).

ITS points us to various cases involving switching companies and in-plant carriers that were found to be private carriers rather than common carriers. However, these cases do not mirror the case at hand. This is not a case such as in *Rabb v. East Camden & Highland Railroad Co.* where the switching company simply moved the railroad's empty cars into storage. *See* No. 5:08–CV–244, 2009 WL 960105, at *2

(W.D.La. April 8, 2009). Rather, ITS served as a vital link in KC Southern's intermodal system. Nor is the relationship analogous to those in *Mack v. East Camden & Highland Railroad Co.*, 297 F.Supp.2d 1052, 1059–60 (W.D.Tenn.2003), and *Loveless v. Railway Switching Services, Inc.*, 106 Ohio App.3d 46, 665 N.E.2d 252, 255 (1995). In both of those cases, the in-plant carriers at issue did not have a relationship with a common carrier through common ownership or by contract. *Mack*, 297 F.Supp.2d at 1060; *Loveless*, 665 N.E.2d at 254. As noted in *Loveless*, the third and fourth considerations cited by *Lone Star* "contemplate an affiliation between an in-plant operation and a full-service, common carrier railroad in order to confer the status of common carrier upon what would otherwise be an in-plant operation." 665 N.E.2d at 254. Similarly distinguishable are the Eighth Circuit cases cited by ITS. In *Iverson v. Southern Minnesota Beet Sugar Co-op.*, the employer at issue was carrying its own products for loading and unloading and had no contractual duties that would have made it part of the railroad's interstate delivery system. 62 F.3d 259, 263–64 (8th Cir. 1995); *see also Aho v. Erie Mining Co.*, 466 F.2d 539, 540–41 (8th Cir.1972) (employer carrying only its own products was not a common carrier).

Here, the relationship between ITS and KC Southern met the factors enumerated in *Lone Star*. Moreover, ITS performed essential aspects of KC Southern's operation as a common carrier by unloading the freight and automobiles from the incoming railcars, reloading the railcars, and making up the outbound trains as part of KC Southern's service to its customers, in addition to providing maintenance and administrative services. Had KC Southern been doing the unloading and loading of its customers' freight or the switching of its railcars itself when an injury occurred, we would find it incredible for KC Southern to argue these activities were not an essential part of its operations as a common carrier. The relationship between ITS and KC Southern shows a case of "actively managing and uniting" the railroad and its contractor into an organized system. *See Lone Star*, 380 F.2d at 648 (quoting *S. Pac. Terminal Co. v. Interstate Commerce Comm'n*, 219 U.S. 498, 523, 31 S.Ct. 279, 55 L.Ed. 310 (1911)).

Therefore, we find that because ITS performed a necessary part of KC Southern's total rail operation and undertook obligations of KC Southern's as a common carrier, Mr. Luman's suit was properly brought under FELA. *See id.* at 646. Mr. Luman's first point is granted.

### Conclusion

Therefore, we reverse and remand for further proceedings consistent with this opinion.

HOWARD, P.J., and WITT, JJ. Concur.