**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 10-1721**

———————————

CHARLES H. DISE,

　　　　　Plaintiff – Appellant,

　　　v.

EXPRESS MARINE, INCORPORATED,

　　　　　Defendant - Appellee,

　　　and

UNIVERSITY OF SOUTH ALABAMA MEDICAL CENTER; JUVONDAS SHUNTA
HODGE, M.D.; AMIN FRONTAN, M.D.; J. DOE # 1; J. DOE # 2; J.
DOE # 3; J. DOE # 4; J. DOE # 5,

　　　　　Defendants.

———————————

Appeal from the United States District Court for the District of
Maryland, at Baltimore.　Catherine C. Blake, District Judge.
(1:07-cv-01893-CCB)

———————————

Argued: September 21, 2011　　　Decided: November 17, 2011

———————————

Before WILKINSON, MOTZ, and DAVIS, Circuit Judges.

———————————

Affirmed by unpublished opinion.　Judge Davis wrote the opinion,
in which Judge Wilkinson and Judge Motz joined.

———————————

**ARGUED:** David W. Skeen, WRIGHT, CONSTABLE & SKEEN, LLP,
Baltimore, Maryland, for Appellant.　JoAnne Zawitoski, SEMMES,
BOWEN & SEMMES, Baltimore, Maryland, for Appellee.　**ON BRIEF:**

Meighan Griffin Burton, WRIGHT, CONSTABLE & SKEEN, LLP, Baltimore, Maryland; Lawrence A. Melfa, BUTLER, MELFA & TAYLOR, PA, Towson, Maryland, for Appellant. Alexander M. Giles, SEMMES, BOWEN & SEMMES, Baltimore, Maryland, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

DAVIS, Circuit Judge:

Appellant Charles H. Dise ("Dise") filed this maritime action to recover for injuries he sustained when a skiff piloted by him and owned by his employer, Appellee Express Marine, Inc. ("EMI"), allided with a bridge piling, and as a result of allegedly negligent medical treatment he received at the University of South Alabama Medical Center ("USA Medical") in the wake of the allision. Dise asserted claims for negligence and vicarious liability under the Jones Act, 46 U.S.C. app. § 688(a) (recodified at 46 U.S.C. § 30104), and unseaworthiness under the general maritime law. EMI counterclaimed to recover for property damage to its skiff. The district court granted summary judgment in favor of EMI on Dise's Jones Act and unseaworthiness claims, and on EMI's property damage counterclaim. We affirm.

I.

A.

At the time of the relevant events, Dise was a Maryland resident employed by EMI as an assistant engineer on the Tug BALTIMORE. EMI is a New Jersey corporation engaged in the business of towing barges and commodities from various East and Gulf Coast locations. Dise began working for EMI in October 2003. In April 2005, EMI assigned Dise to work on the Tug

3

BALTIMORE as an assistant engineer. His duties included standing watch in the engine room during specified shifts.

During July 2005, the Tug BALTIMORE was assisting with the loading of a barge near Mobile, Alabama. Around the time of Dise's assignment to the Tug BALTIMORE, EMI purchased a 14-foot Boston Whaler ("the skiff") for the purpose of taking draft readings on the barge associated with the Tug BALTIMORE.[1] According to First Mate Douglas Covil, prior to the date of the accident, July 19, 2005, the skiff had been used only for taking draft readings. After the accident, the skiff was also used to transport groceries and supplies to and from the tug.

On the evening of July 19, 2005, the Tug BALTIMORE and the associated barge were docked at a terminal on Three Mile Creek in Mobile, Alabama. In addition to Dise, the crew members onboard the Tug BALTIMORE included Captain Michael Daniels, First Mate Covil, Chief Engineer Sammy Edwards, Bargeman Jerry Harper, Assistant Bargeman George Greggs, and the cook, Otis Foster. Just before midnight, Daniels asked Greggs to take draft

---

[1] "Draft" is "the depth of water required to float a vessel," and "draft marks" are "the Arabic numerals on both sides of the bow and stern of a vessel to show the ship's draft." Thompson Lenfestey & Tom Lenfestey, The Sailor's Illustrated Dictionary 142-43 (Globe Pequot ed., 2001). In the context of this case, taking "draft readings" consists of recording the draft marks at the waterline on the barge being towed by the Tug BALTIMORE. See J.A. 128-30.

readings from the adjoining barge using the skiff. Daniels also instructed Greggs to deliver a radio to Harper on the barge. Although Greggs had never operated the skiff prior to that night, both Daniels and Covil had used the skiff to take draft readings on numerous occasions. In his deposition, Daniels testified that he had taken the skiff out earlier that very evening to measure the drafts. Neither party testified to experiencing any problems with the skiff.

Dise was present when Daniels ordered Greggs to take the draft readings. Dise asked Daniels for permission to drive the skiff while Greggs took the draft readings. According to the testimony of Daniels, which was corroborated by Covil, Daniels replied to Dise with something along the lines of, "it d[oes]n't take two people to read drafts." J.A. 55, 71. After Daniels left the galley, however, Dise informed Covil that he was planning to accompany Greggs, and Covil did not explicitly tell him not to follow through on that plan.

Dise and Greggs met on the deck a few minutes later, boarded the skiff, and proceeded to the barge to take the draft readings. Dise operated the skiff, while Greggs sat toward its bow. Once they had acquired the initial draft readings, Dise and Greggs decided to pilot the boat down Three Mile Creek. Dise testified that it was Greggs's idea to take the skiff downriver to see a ship moored nearby, while Greggs testified that Dise

5

wanted "to run the boat to see how it operated," J.A. 174. It is undisputed that Dise was at the helm of the skiff during the entire incident.

Dise steered the skiff downriver toward the moored ship, passing under a railroad bridge along the way. Shortly after passing under the bridge, a call came in to the skiff to take a second set of draft readings because, according to Greggs, Harper had noticed a "discrepancy" and so wanted a new set of readings taken. J.A. 175. Dise testified that he heard the word "emergency" over the call, immediately turned the boat upriver, and accelerated on a course toward the barge. J.A. 325. In his deposition testimony, Dise claimed the fastest he drove the boat was 17 or 18 knots, short of full throttle. However, in his diary entry made after that night, he described the speed of the skiff as "full speed ahead." See J.A. 151-53. Greggs also testified that, when Dise turned the boat around, "he opened up the boat full throttle," which Greggs ascertained because he could see that the throttle was all the way forward. J.A. 602.

Dise claims that when he turned the skiff around, he was blinded by lights on the ship ahead of him and could not clearly see the bridge, so he asked Greggs to shine the skiff's spotlight, which he had been using to take the draft readings, on the bridge. When Greggs did not respond, however, Dise did not slow down or await Greggs's compliance; indeed, Dise recalls

6

"spe[eding] up a little bit more" at that point. J.A. 328. Shortly thereafter, the skiff crashed into one of the bridge's bulkheads, and Dise and Greggs were thrown into the water, suffering injuries to their extremities. According to Dise, he could not make out the contours of the bridge without the spotlight illuminating it. Greggs testified that it was a clear night, he could clearly see the bridge and its bulkheads up until the moment of impact, and he yelled to Dise to slow down just before the crash.

After the allision, Dise and Greggs managed to hold onto the skiff and get to the shore of Three Mile Creek. Once ashore, Dise located a watchman on the railroad bridge who called 911. An ambulance responded to the scene and took Dise and Greggs to USA Medical in Mobile, Alabama. Upon learning of the accident, EMI dispatched Keith Kirkeide, a company representative, to Mobile to oversee Dise's medical care. EMI paid all of the medical expenses that Dise incurred while at USA Medical, which included treatment of a major injury to his left leg.

USA Medical discharged Dise on July 23, 2005, at which point he boarded a flight to travel to Baltimore. During the course of the flight, Dise became severely ill. An ambulance was called and transported Dise to St. Agnes Hospital immediately upon his arrival in Baltimore. Doctors at St. Agnes Hospital discovered that Dise's leg wound had a severe bacterial

7

infection requiring an immediate operation and extensive treatment. As a result, St. Agnes Hospital transferred Dise to the University of Maryland Shock Trauma Center the next day for additional treatment. Over the next two years, Dise underwent multiple surgeries in an attempt to restore function to his leg. He reached maximum medical improvement on January 31, 2008, though he has permanent injuries to his leg. Dise did not return to work for EMI after the accident.

B.

Dise filed suit in the district court on July 17, 2007, seeking damages under the Jones Act, 46 U.S.C. app. § 688(a), and various maritime doctrines. The complaint alleged five counts: (1) negligence under the Jones Act; (2) unseaworthiness under the general maritime law; (3) vicarious liability under the Jones Act for negligent provision of medical care; (4) maintenance and cure; and (5) unpaid wages. EMI denied all liability and counterclaimed for recoupment of maintenance and cure payments made to Dise, indemnification for payments made to Greggs, and reimbursement for repairs to EMI's skiff following the accident.

After the close of discovery, the parties filed cross-motions for summary judgment. EMI moved for summary judgment or partial summary judgment as to all claims in the complaint on the basis that each of Dise's causes of action lacked merit. In

8

the alternative, EMI sought summary judgment on its affirmative defense that it was entitled to exoneration or limitation of liability to the value of the skiff at the time of the accident. Dise moved for summary judgment on his vicarious liability claim, the entirety of EMI's counterclaim, and EMI's affirmative defenses.

The district court granted summary judgment in favor of EMI as to all five counts in Dise's complaint, and denied Dise's cross-motion for summary judgment on his vicarious liability claim. Dise v. Express Marine, Inc., 651 F. Supp. 2d 457, 471 (D. Md. 2009). The district court granted summary judgment in favor of Dise on EMI's counterclaims seeking recoupment of maintenance and cure and indemnification for payments made to Greggs. Id. Rather than ruling on EMI's motion for summary judgment on its counterclaim for damage to the skiff, the district court instructed EMI to advise the court within ten days if it still wished to pursue the counterclaim in light of the court's other summary judgment rulings. Id. In response, EMI timely moved for summary judgment to resolve its sole remaining claim. Dise opposed the motion. On June 2, 2010, the district court granted summary judgment in favor of EMI on its claim for damages to the skiff. Dise v. Express Marine, Inc., 714 F. Supp. 2d 558, 562 (D. Md. 2010). Dise timely filed the instant appeal.

II.

Dise appeals the district court's grant of summary judgment in favor of EMI on his claims for negligence under the Jones Act, unseaworthiness under the general maritime law, and vicarious liability under the Jones Act for negligent provision of medical care, as well as EMI's counterclaim for damage to the skiff. We review the district court's grant of summary judgment de novo. See Wash. Metro. Area Transit Auth. v. Potomac Inv. Props., Inc., 476 F.3d 231, 234 (4th Cir. 2007).

A.

The Jones Act provides a cause of action in negligence for "any seaman who shall suffer personal injury in the course of his employment," 46 U.S.C. app. § 688(a), and incorporates by reference the judicially-developed doctrine of liability under the Federal Employer's Liability Act ("FELA"), 45 U.S.C. § 51 et seq., thereby according seamen rights parallel to those of railway employees. Kernan v. American Dredging Co., 355 U.S. 426, 439 (1958); Hernandez v. Trawler Miss Vertie Mae, 187 F.3d 423, 436 (4th Cir. 1999); see also 46 U.S.C. app. § 688(a) (providing that "all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply" to a seaman's Jones Act action). FELA provides in relevant part that railway employees enjoy a right of recovery for injury or death resulting in whole

10

or in part from the negligence of their employer or their employers' officers, agents, or employees. 45 U.S.C. § 51. Accordingly, to prevail on a negligence claim under the Jones Act, a seaman must show: "(1) personal injury in the course of his employment; (2) negligence by his employer or an officer, agent, or employee of his employer; and (3) causation to the extent that his employer's negligence was the cause 'in whole or in part' of his injury." Hernandez, 187 F.3d at 436.

To further the humanitarian purpose of FELA, Congress eliminated several common-law tort defenses that had traditionally restricted recovery by injured workers. Consol. Rail Corp. v. Gottshall, 512 U.S. 532, 542 (1994). Specifically, FELA abolishes the common law fellow-servant rule and the assumption of risk defense, rejects the doctrine of contributory negligence in favor of comparative negligence, and prohibits employers from contractually exempting themselves from FELA. Id. at 542-43; see also 45 U.S.C. §§ 51, 53-55. The Supreme Court liberally construes FELA, but "has cautioned that . . . FELA, and derivatively the Jones Act, is not to be interpreted as a workers' compensation statute and that unmodified negligence principles are to be applied as informed by the common law." Hernandez, 187 F.3d at 436-37 (citing Gottshall, 512 U.S. at 543-44)). In sum, "in establishing a Jones Act claim based on negligence, the elements of duty, breach, and injury draw on

11

common law principles; the element of causation is relaxed; and common law defenses are modified or abolished." Id. at 437 (citations omitted).

In order to establish negligence, a seaman-plaintiff in a Jones Act action must prove by a preponderance of the evidence that his employer breached a duty to protect him against a foreseeable risk of harm. Martin v. Harris, 560 F.3d 210, 216 (4th Cir. 2009) (citing Hernandez, 187 F.3d at 436). A shipowner-employer's duty under the Jones Act is to provide a seaman-employee with a reasonably safe place to work. Id. at 216 (internal citations and quotation marks omitted). This duty extends from the vessel to the shore, provided the seaman is acting in the course of his employment.[2] Id. (citing O'Donnell v. Great Lakes Dredge & Dock Co., 318 U.S. 36, 39 (1943)). Turning to the sufficiency of the evidence in this case, the question is whether the evidence before the district court on EMI's motion for summary judgment, when viewed in the light most favorable to Dise, rose above the level of mere speculation and conjecture,

---

[2] The district court, having determined that EMI was not negligent, "assumed without deciding" that Dise was acting in the course of employment at the time of the accident. Dise, 651 F. Supp. 2d at 465. We note that the parties disagree as to the scope of this standard, but we likewise find that Dise has failed to establish a genuine dispute of material fact as to EMI's negligence, and that EMI is therefore entitled to judgment as a matter of law. Accordingly, like the district court, we do not reach the issue of whether Dise was acting "in the course of employment" at the time of the accident.

12

to the point where a factfinder could reasonably find that the risk of harm posed was reasonably foreseeable.

Dise argues on appeal that the evidence establishes genuine disputes of material fact with respect to several theories of negligence, including: (1) EMI's poor training and instruction of Greggs; (2) the absence of written or verbal guidelines for use of the skiff; (3) Greggs's failure to shine the spotlight; and (4) defective steering of the skiff. In addition, Dise argues that the district court, in finding that Dise's own negligence was the "sole proximate cause" of the accident, applied an erroneous causation standard. The district court addressed each of Dise's theories of negligence in turn and, finding no genuine disputes of material fact, concluded that EMI was entitled to judgment as a matter of law. Having had the benefit of oral argument and having carefully reviewed the briefs, record, and controlling legal authorities, we reach the same conclusion. Accordingly, as to Dise's Jones Act negligence claim, we affirm on the basis of the district court's well reasoned opinion.[3] See Dise, 651 F. Supp. 2d 457.

---

[3] Given that Dise bears the burden of proof on all elements of his Jones Act negligence claim, the absence of evidence that EMI breached a duty to Dise is dispositive, irrespective of the Jones Act causation standard applied by the district court. Consequently, we do not reach Dise's causation argument.

13

B.

Dise's unseaworthiness claim is separate and distinct from his negligence claim. See Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 498 (1971). General maritime law imposes a duty upon shipowners to provide seaworthy vessels, that is, vessels reasonably fit for their intended use. Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550 (1960). This duty extends to the vessel itself, its equipment, and its crew. It is an absolute duty requiring no knowledge on the part of the shipowner and exists independently of the duty to exercise reasonable care under the Jones Act, 46 U.S.C. app. § 688(a). Id. at 548-49. In order to prevail on a claim for unseaworthiness, a plaintiff must demonstrate that "the unseaworthy condition of the vessel was the proximate or direct and substantial cause of the seaman's injuries." Hernandez, 187 F.3d at 439 (citing Gosnell v. Sea-Land Serv., Inc., 782 F.2d 464, 467 (4th Cir. 1986)). Thus, the "causation burden is more demanding than the one the plaintiff undertakes under the Jones Act." Id. (internal quotation marks and citations omitted).

Dise argues that "the defective steering of the skiff as well as a poorly trained and instructed fellow crewman, Greggs, with regard to use of the skiff, are unseaworthy conditions." Appellant's Br. 16. As set forth supra, however, Dise has failed to present sufficient evidence to establish a material dispute

14

of fact as to whether Greggs was qualified to operate the skiff or whether the steering was defective. Regardless, it is undisputed that the intended use of the skiff, which was new when delivered to the Tug BALTIMORE only a few months prior to the accident, was to take draft readings from the barge. Defective steering at high speed, even if proved, would not render the skiff unfit for this use as draft readings are not, and indeed cannot be, taken at high speed. In addition, even if Dise were able to show that deficiencies in the crew and the vessel created an unseaworthy condition, he still must identify admissible facts sufficient to demonstrate that one of these conditions was the "proximate or direct and substantial cause" of his injury. We agree with the district court's conclusion that neither was. Accordingly, we affirm the district court's grant of summary judgment in favor of EMI on Dise's unseaworthiness claim.

## C.

The admiralty law doctrine of maintenance and cure imposes upon a seaman's employer a non-waivable and non-delegable duty to provide food, lodging, and medical treatment to a seaman injured in the course of employment. 5 Robert Force & Martin J. Norris, Law of Seamen § 26-1 (5th ed. 2003); see also De Zon v. Am. Pres. Lines, 318 U.S. 660, 667 (1943). A sick or injured seaman has a cause of action under the Jones Act for his

15

employer's wrongful failure to provide proper medical attention. De Zon, 318 U.S. at 667. Because the Jones Act incorporates the principles of FELA, 45 U.S.C. § 51 et seq., which renders an employer liable for injuries negligently inflicted by its "officers, agents, or employees," a shipowner can violate its duty to provide prompt and adequate medical care in two ways: "directly, such as when the shipowner fails to get a crewman to a doctor when it is reasonably necessary and the ship is reasonably able to do so; and vicariously, when the shipowner selects a doctor who acts negligently." Olsen v. Am. Steamship Co., 176 F.3d 891, 896 (6th Cir. 1999). Dise raises only the latter type of claim, arguing that EMI is vicariously liable for the allegedly negligent provision of medical care by USA Medical providers Drs. Juvondas Shunta Hodge and Amin Frontan following the accident.

The district court granted EMI's motion for summary judgment and denied Dise's motion for summary judgment on his claim alleging vicarious liability under the Jones Act. Dise, 651 F. Supp. 2d at 469. As a preliminary matter, the district court determined that "in order to be vicariously liable for the medical malpractice of a treating physician, the shipowner must take some affirmative act in selecting or engaging the physician." Id. at 468. Noting that the agency standard is relaxed under the Jones Act, the district court nevertheless

16

concluded that Dise had failed to present evidence of an affirmative act on the part of EMI sufficient to give rise to an agency relationship with the USA Medical providers as a matter of law. Id. at 469.

Dise argues on appeal that the district court's agency analysis is inconsistent with the Supreme Court's decisions in Sinkler v. Missouri Pacific Railroad Co., 356 U.S. 326 (1958), and Hopson, et al. v. Texaco, Inc., 383 U.S. 262 (1966), which he avers establish that agency should be interpreted broadly in the Jones Act context consistent with the employer's non-delegable duty to provide cure. In the alternative, Dise contends that even if an affirmative act by EMI is a necessary predicate to an agency relationship with the USA Medical providers, the district court erred in finding that the evidence does not establish such a relationship.

EMI's vicarious liability for the alleged negligence of the USA Medical providers turns upon the scope of "agency" in the Jones Act context. The case law is instructive with regard to these parameters. The Supreme Court has held that when a railroad employee's injury is caused in whole or in part by the fault of others performing, under contract, operational activities of his employer, such others are "agents of the employer within the meaning of . . . FELA." Sinkler, 356 U.S. at 331-32. The same standard applies in the Jones Act context. See

17

*Fitzgerald v. A.L. Burbank & Co.*, 451 F.2d 670, 680 (2d Cir. 1971) (applying *Sinkler* in a Jones Act case). Accordingly, for example, where a ship carries an onboard physician employed by the ship, vicarious liability attaches to the shipowner for the physician's negligence. *De Zon*, 318 U.S. at 668. Courts have also consistently held that an agency relationship exists when a shipowner engages the services of an on-shore physician. *See, e.g.*, *Olsen*, 176 F.3d at 895-96 ("[T]he shipowner is liable for the negligence of an on-shore physician that it hires to treat its crewman.") (collecting cases); *Cent. Gulf S.S. Corp. v. Sambula*, 405 F.2d 291, 299 (5th Cir. 1968) (shipowner vicariously liable where its agent brought an injured seaman to physician who misdiagnosed and mistreated plaintiff's eye injury). Liability does not attach, however, when a seaman selects his own physician. *See* *Joiner v. Diamond M Drilling Co.*, 688 F.2d 256, 262 n.9 (5th Cir. 1982) ("[W]e can find no case holding a shipowner vicariously liable for the negligence of an onshore physician selected by the injured seaman himself."). Similarly, the Seventh Circuit has held that when an employer merely refers a seaman to a negligent medical provider, the provider is "neither [an] employee[] of the defendant nor acting on behalf of [the defendant], thus eliminating any basis for vicarious liability." *Greenwell v. Aztar Indiana Gaming Corp.*, 268 F.3d 486, 489, 492-93 (7th Cir. 2011).

18

Consistent with Dise's argument, the Supreme Court has advised that "an accommodating scope must be given to the word 'agents' to give vitality to the standard governing the liability of carriers to their workers injured on the job." Sinkler, 356 U.S. at 330-31. Even given this relaxed agency standard, however, the district court properly determined that, based upon the case law, an agency relationship giving rise to vicarious liability under the Jones Act requires "some affirmative act [on the part of the shipowner] in selecting or engaging" an on-shore medical provider. Dise, 651 F. Supp. 2d at 468.

Relying primarily upon Sinkler and Hopson, Dise argues that a shipowner's vicarious liability for negligent medical treatment arises from its non-delegable duty to provide maintenance and cure, rather than from any affirmative act taken in selecting the provider. Neither case supports his position, however. In Sinkler, the Supreme Court held that when an employee's injury was caused by the fault of others performing, under contract, operational activities of the employer, such others were "agents" of the employer within the meaning of FELA. 356 U.S. at 331-32. In Hopson, the Supreme Court applied Sinkler in a Jones Act case to find that a shipowner who had a duty to bring an incapacitated seaman before the U.S. Consul prior to discharge in a foreign port, and who selected a taxi service to

19

transport the seaman, as it had done many times before, bore the responsibility for the negligence of the driver it chose. 383 U.S. at 264. Both cases support the principle that, because a seaman's employer is under an absolute duty to provide medical treatment to a sick or injured seaman, medical personnel selected by it to render that treatment are deemed to be engaged in the ship's business as "agents" despite the fact that the practitioner may be an independent contractor or completely unrelated to the ship. However, these cases do not establish that <u>every</u> provider of medical services to a sick or injured seaman is automatically deemed an agent of the shipowner by virtue of the shipowner's duty to provide maintenance and cure.[4]

In order to survive summary judgment, Dise must present evidence establishing, at minimum, a genuine dispute of material fact with respect to whether EMI took some affirmative act to select or otherwise engage the USA Medical providers. Dise does

---

[4] The circuit and district court cases Dise cites as support are similarly inapposite. <u>See</u> <u>De Centeno v. Gulf Fleet Crews, Inc.</u>, 798 F.2d 138 (5th Cir. 1986) (shipowner liable where vessel's agent arranged for seaman to see local physician who negligently failed to recognize signs of diabetes and therefore failed to order blood test, where proper diagnosis could have avoided diabetic coma and death); <u>Fitzgerald</u>, 451 F.2d 670 (2d Cir. 1971) (shipowner liable for negligence of doctor it selects); <u>Sambula</u>, 405 F.2d 291 (shipowner liable for negligently selecting general practitioner, rather than ophthalmologist, who misdiagnosed and mistreated plaintiff's eye).

not dispute that there is no evidence in the record that EMI affirmatively engaged the USA Medical providers to treat him, but instead argues that EMI constructively selected the USA Medical providers by instituting a written emergency response policy that instructs employees to "call 911 first." See J.A. 722. Although it is a close question, we conclude that the existence of the "call 911 first" policy alone is insufficient as a matter of law to demonstrate that EMI selected or otherwise engaged USA Medical and its providers in particular. Instituting such a policy is essentially the equivalent of providing each employee with a list of every medical provider in the region. Such an act does not indicate that the employer selected or engaged any particular provider.

Dise also contends that EMI acquiesced in USA Medical's treatment of him by paying for his care and not moving him to a different facility, thereby establishing an agency relationship. EMI was required to pay Dise's medical expenses in order to satisfy its non-delegable duty to provide cure, and did not select or engage USA Medical in doing so. EMI's failure to move Dise to another hospital is also insufficient as a matter of law to establish that EMI selected or otherwise affirmatively engaged USA Medical. Thus, we affirm the district court's grant of summary judgment in favor of EMI on Dise's claim for vicarious liability under the Jones Act.

21

We turn, finally, to the district court's award of affirmative relief to EMI. Dise argues that EMI may not assert its property damage counterclaim because the Jones Act prohibits counterclaims by employer-shipowners against employee-seamen, as such actions are incompatible with the principles of maritime law. The district court acknowledged that neither the Supreme Court nor this court has directly addressed this question, but reasoned that "the consistency with which these courts have applied FELA to Jones Act cases and permitted counterclaims under FELA weighs in favor of permitting EMI's counterclaim." Dise, 714 F. Supp. 2d at 560. Consequently, the district court granted EMI's motion for summary judgment on its counterclaim for damages to the skiff in the amount of $3,254.96, the undisputed cost of repairs. Id. at 562.

In reaching this result, the district court relied primarily upon this court's decision in Cavanaugh v. W. Md. Ry. Co., 729 F.2d 289, 294 (4th Cir.), cert. denied, 469 U.S. 872 (1984), which held that FELA does not prohibit employer counterclaims against employees in the railroad context, and a subsequent Fifth Circuit decision which held, largely based upon Cavanaugh, that the Jones Act does not bar employer counterclaims in the maritime context, Withhart v. Otto Candies, L.L.C., 431 F.3d 840 (5th Cir. 2005). Id. at 560-61. Dise

22

contends that Cavanaugh and Withhart were incorrectly decided, and argues in the alternative that even if we extend Cavanaugh to this context, considerations unique to the maritime context militate against extending our decision in that case to Jones Act actions, as the Fifth Circuit did in Withhart. Although we recognize that Cavanaugh did not squarely address the issue before us in the instant maritime case, we decline to so readily discount its relevance given that the Jones Act incorporates the judicially-developed doctrine of liability under FELA.

In Cavanaugh, we held that FELA neither explicitly nor implicitly proscribes the filing of a counterclaim by a railroad in a FELA case to recover for property damages sustained by reason of the sole negligence of a plaintiff-employee. 729 F.2d at 294. We noted that if the railroad-employer were denied the right to assert a property damage counterclaim during the employee's FELA suit, the compulsory counterclaim requirement under Fed. R. Civ. P. 13(a) would prohibit the employer from later bringing the claim, thereby unfairly affording the employee absolute immunity from any liability for his negligence. Id. at 291. Turning to the statute itself, we rejected the contention that Sections 5 and 10 of FELA, 45 U.S.C. §§ 55 & 60, implicitly bar employer counterclaims against employees. Id.

23

Section 5 of FELA provides that "any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this act, shall to that extent be void . . ." 45 U.S.C. § 55. Section 10 similarly provides that "any contract, rule, regulation, or device whatsoever, the purpose, intent or effect of which shall be to prevent employees of any common carrier from furnishing voluntary information to a person in interest as to the facts incident to the injury or death of any employee, shall be void . . ." 45 U.S.C. § 60. We reasoned that Section 5 clearly defines "device" as having the purpose of exempting the common carrier from liability, and an employer negligence counterclaim does not exempt the common carrier from liability; therefore, an employer negligence counterclaim is not a prohibited device under Section 5. Cavanaugh, 729 F.2d at 291-92. With respect to Section 10, we found that "there is no authority for the assumption that the possibility of a counterclaim being filed creates an unfair advantage in favor of the defendant or improperly coerces or intimidates the injured party from seeking redress for his injuries . . . The same argument could be advanced against the admissibility of a counterclaim in any tort action." Id. at 293.[5]

_____

[5] We note that our reasoning in Cavanaugh has not gone
(Continued)

24

The First and Eighth Circuits have followed Cavanaugh, holding that employer property damage counterclaims are actionable under FELA. See Sprague v. Boston & Maine Corp., 769 F.2d 26, 29 (1st Cir. 1985); Nordgren v. Burlington Northern R.R. Co., 101 F.3d 1246, 1253 (8th Cir. 1996). The Eighth Circuit held that employer property damage counterclaims are not "devices" under Section 5 and 10 of FELA because the suits do not absolve the employers of liability. Nordgren, 101 F.3d at 1251. Interpreting the phrase "any device whatsoever" in Sections 5 and 10, the Eighth Circuit looked to the terms preceding the phrase, namely "contract," "rule," and "regulation," and determined that because they refer to legal instruments that railroads attempt to use to evade liability,

---

unquestioned. Dissenting from the divided panel's majority opinion in Cavanaugh, Judge Hall argued that the majority construed Sections 5 and 10 too narrowly. 729 F.2d at 295. According to the dissent, the counterclaim at issue was "a 'device' calculated to intimidate and exert economic pressure on the employee, to curtail and chill his rights, and ultimately to exempt the railroads from liability under the FELA." Id. at 296. The dissent further found that the counterclaim violated Section 10 insofar as it "would prevent employees from voluntarily furnishing information regarding the extent of their negligence." Id. In Stack v. Chi., Milwaukee, St. Paul and Pac. R.R., 615 P.2d 457 (Wash. 1980), the Washington Supreme Court similarly found that employer negligence counterclaims violate Section 5 of FELA because such suits limit employer liability, as employees would then be reluctant to file FELA actions, id. at 459. In Yoch v. Burlington N. R.R., 608 F. Supp. 597, 598 (D. Colo. 1985), the Colorado federal district court adopted Stack's rationale in holding that FELA prohibits employer negligence countersuits.

25

the term "devices" should be viewed in the same context. Id. at 1250-51. Therefore, according to the Nordgren court, "any device whatsoever" is simply a catchall phrase "referring only to any other creative agreement or arrangements the railroad might come up with to exempt itself from liability," and does not include employers' negligence countersuits. Id.

In Withhart, the Fifth Circuit considered as a matter of first impression in the federal courts of appeals whether a shipowner-employer in a Jones Act action may assert negligence and indemnity claims against its seaman-employee for property damage allegedly caused by the employee's negligence. 431 F.3d at 840. Relying largely upon Cavanaugh, the court held that "no statutory authority in FELA, and consequently, in the Jones Act, prohibits a shipowner-employer from pursuing a claim against its negligent seaman-employee for property damage." Id. at 845. The Withhart court noted that negligence was an actionable wrong under maritime law prior to enactment of the Jones Act, 431 F.3d at 842 (internal citation omitted), and reasoned that permitting employer counterclaims would not exempt employers from liability or unfairly prejudice employees, id. at 844. The Witthart court concluded that allowing an employer counterclaim would not narrow the remedies available to employees under the Jones Act. Id. at 845.

26

Consistent with the district court's analysis, the extant authority weighs in favor of allowing EMI's counterclaim based upon the particular facts of this case. EMI's counterclaim for damage to its skiff does not act as a liability-exempting "device" of the sort prohibited by FELA, 45 U.S.C. §§ 55 and 60. EMI sought to limit its liability to $7,945.00 under the Limitation of Liability Act, 46 U.S.C. §§ 30501, et seq., which so far as bears on this case limits a shipowner's liability to the value of the ship, 46 U.S.C. § 30505(a), but counterclaimed for the lesser amount of $3,254.96, the undisputed cost of repairs. In addition, we have found that EMI was not negligent to any extent, so its property damage counterclaim does not serve as a set off to liability. For these reasons, we affirm the district court's grant of summary judgment in favor of EMI on its counterclaim for property damage to the skiff. We leave for another day, however, the question of whether property damage counterclaims by shipowner-employers against negligent seaman-employees are actionable in every Jones Act case.[6]

---

[6] Notably, in a decision postdating the district court's order granting summary judgment in this case, the Seventh Circuit held that "combining a property-damage counterclaim with a limitation of liability in order to wipe out a substantial personal injury claim under the Jones Act is a liability-exempting device forbidden by the Act." Deering v. Nat'l Maint. & Repair, Inc., 673 F.3d 1039, 1048 (7th Cir. 2010) (Posner, J.). We have no occasion in the case at hand to examine Deering.

27

III.

For the reasons set forth, we are persuaded, as was the district court, that the evidence in the record fails to establish a genuine dispute of material fact as to EMI's negligence or its vicarious liability for the alleged negligence of the USA Medical providers. In order to establish an agency relationship for the purposes of vicarious liability in a Jones Act action, the seaman-employee must demonstrate some affirmative act on the part of a shipowner-employer in selecting or otherwise engaging the negligent medical provider. Thus, we affirm the district court's grant of summary judgment in favor of EMI on Dise's Jones Act claims. With respect to his unseaworthiness claim under the general maritime law, Dise failed to establish that either the skiff or the crew constitutes an unseaworthy condition. Accordingly, we affirm the district court's grant of summary judgment in favor of EMI on the unseaworthiness claim.

Finally, while neither this court nor the Supreme Court has decided whether employer property damage counterclaims are actionable in Jones Act cases, we have no hesitation in concluding that EMI's counterclaim does not serve as a liability-exempting device under the particular facts of the instant case, and we apply the rule supported by the weight of authority favoring allowance of EMI's counterclaim. Thus, we

28

affirm the district court's grant of summary judgment on EMI's counterclaim for damage to the skiff. We acknowledge, however, that under circumstances not present in the case before us, some employer property damage counterclaims may be impermissible under the FELA, Jones Act, and general remedial principles of maritime law. See Deering v. Nat'l Maint. & Repair, Inc., 673 F.3d 1039 (7th Cir. 2010).

AFFIRMED